UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__1/3/2025__
```

-------------------------------------------------------------------X
:
ANDREW DELANEY,                                             :
:
               Plaintiff,          :
:                    24-cv-6287 (LJL)
    -v-                                                   :
:                    OPINION AND ORDER
:
HC2, INC., STEPHANOS ZANNIKOS, MICHAEL                      :
JOHN ESKER NACCHIO, and TOYOTA MOTOR                        :
NORTH AMERICA, INC.,                                        :
               Defendants.          :
                                  X
-------------------------------------------------------------------

LEWIS J. LIMAN, United States District Judge:

Defendants HC2, Inc. ("HC2"), Stephanos Zannikos ("Zannikos"), and Michael John

Esker Nacchio ("Nacchio" and with HC2 and Zannikos, the "HC2 Defendants") and Defendant

Toyota Motor North America, Inc. ("TMNA," or "Toyota") each move, pursuant to Federal Rule

of Civil Procedure 12(b)(6), for an order dismissing the amended complaint, Dkt. No. 1-3 (the

"Complaint" or "Compl."), of Plaintiff Andrew Delaney ("Plaintiff" or "Delaney") with

prejudice. Dkt. Nos. 7, 20.

For the following reasons, the motions to dismiss are granted.

## BACKGROUND

The following facts are drawn from Plaintiff's Complaint, "documents appended to the

complaint or incorporated in the complaint by reference, and matters of which judicial notice

may be taken." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016).[1]

---

[1] Plaintiff filed an amended complaint on August 18, 2024, with six attached exhibits. Dkt. No.
1-2. The same day, he filed a corrected amended complaint, which is the operative complaint in
this case. Compl. The corrected amended complaint did not attach the exhibits but continued to
reference them. *See, e.g.*, Compl. ¶ 20. The statements in these exhibits, if otherwise properly
considered, may therefore be deemed incorporated in the operative complaint by reference. *See*

The Complaint focuses primarily on two prior court proceedings: 1) an action by HC2 against

Delaney in the Southern District of New York and 2) Delaney's chapter 7 bankruptcy in the

Eastern District of New York.  The Court takes judicial notice of documents in those

proceedings, "not for the truth of the matters asserted in the other litigation, but rather to

establish the fact of such litigation and related filings."  *Glob. Network Commc'ns, Inc. v. City of

N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006).

### I.      Parties and Employment Relationship

HC2, which has used the d/b/a Hire Counsel, is a District of Columbia corporation with

its principal place of business in New York.  Compl. ¶¶ 2, 19.  TMNA is a California corporation

with its principal place of business in Texas.  *Id.* ¶ 5.  Plaintiff is a natural person residing in the

Republic of the Philippines who asserts he is a former employee of HC2 and TMNA.  *Id.* ¶¶ 1,

42.

TMNA is a client or former client of the law firm WilmerHale.  *Id.* ¶¶ 26 n.9, 46.  The

complaint quotes from court documents which describe WilmerHale as a customer of HC2.  *Id.*

---

Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference . . . in any other pleading or motion.").  Because each exhibit is a judicial document, the Court may properly consider the statements in each exhibit "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation."  *See Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006); Dkt. No. 1-2 Exs. A, B, C, D, E, F.  Plaintiff relies on the statements in Exhibit B for their truth.  *See* Compl. ¶ 20 (citing Exhibit B for the fact that defendants gave the Trustee false information).  Exhibit B, which consists of over 100 pages of billing records which Plaintiff cites to in a general fashion, may not be considered for this purpose consistent with "Rule 8(a)'s requirement of a short and plain statement of a claim for which relief could be granted."  *Smith v. Hogan*, 794 F.3d 249, 255 (2d Cir. 2015); *see id.* (refusing to consider an affidavit "buried in 170 pages of exhibits" containing "novel factual allegations," on the grounds that doing so would make "[t]he exercise of determining exactly what combination of documents constitutes the complaint and what the complaint plausibly alleges . . . a needlessly complicated adventure for both defendants and courts"); *Ahmad v. Experian Info. Sols., Inc.*, 2023 WL 8650192, at *5 (S.D.N.Y. Dec. 14, 2023) ("Defendant is entitled to know the allegations against it, and to have those allegations framed in separate paragraphs, 'with sufficient clarity to allow the defendant to frame a responsive pleading.'" (quoting *Jackson v. Warning*, 2016 WL 7228866, at *4 (D. Md. Dec. 13, 2016))).

¶ 22.  The same quoted documents state that Delaney participated in "a document review project" for Toyota.  *Id.*  Other statements in the complaint describe Delaney as a WilmerHale "[t]emp." *Id.* ¶¶ 12, 13 n.3.

Zannikos is an attorney licensed to practice law in New York, and he maintains an office for the practice of law in New York.  *Id.* ¶ 3.  He is HC2's general counsel.  *Id.*  Nacchio is also an attorney licensed to practice law in New York, and he maintains an office for practice of law in New Jersey.  *Id*. ¶ 4.  Nacchio was HC2's outside counsel.  *Id.*

## II.    The HC2 Lawsuit

On April 22, 2020, HC2 filed a lawsuit against Delaney (the "HC2 Lawsuit") in the Southern District of New York (Liman, J.).  *Id.* ¶ 11 n.1; *see* Dkt. No. 1, *HC2, Inc. v. Messer* ("*HC2 Lawsuit*"), No. 20-cv-3178 (S.D.N.Y.).[2]  HC2 sought a temporary restraining order and preliminary injunction based on claims of breach of contract and faithless servant.  Compl. ¶ 11 n.1.[3]  The Complaint was verified by Zannikos.  Compl. ¶ 22 n.6.

The Court denied HC2's initial request for *ex parte* relief, but after a hearing on April 29, 2020, granted a temporary restraining order preventing Delaney from "divulging any information that is privileged, confidential or protected by his non-disclosure and/or employment agreements" with HC2.  *HC2 Lawsuit*, Dkt. No. 14.[4]  However, on May 27, 2020, the Court denied HC2's motion for a preliminary injunction, noting that the demand letter on which the

---

[2] This case was filed under the name *HC2 v. Delaney*, but later renamed due to the substitution of the trustee in bankruptcy as defendant.  *See HC2 Lawsuit*, Dkt. Nos. 136, 156.

[3] Though not described in the complaint here, HC2 alleged that Delaney manufactured a false wrongful termination claim and demanded $450,000 from a corporate client while threatening the disclosure of privileged and confidential information.  See *HC2 Lawsuit*, Dkt. No. 1.

[4] The Complaint alleges that "[o]n April 20, 2020, Judge Liman *denied* HC2's TRO application."  Compl. ¶ 11 n.1.  This is inaccurate.  HC2's complaint was not filed until April 22, 2020, and the Court granted a temporary restraining order.

claim rests is "a routine demand letter and it's not an extortion."  Compl. ¶ 11 n.1; *HC2 Lawsuit*, Dkt. No. 65 at 21.

Delaney filed counterclaims in the HC2 Lawsuit alleging whistleblower retaliation, breach of a confidential relationship, intentional infliction of emotional distress, and abuse of process.  *See* Compl. ¶ 42; *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 90 (S.D.N.Y. 2020).  On December 18, 2020, the Court dismissed these counterclaims.  *Delaney*, 510 F. Supp. 3d 86.  On January 13, 2021, Delaney appealed from this order of dismissal.  *See* Compl. ¶ 42; *HC2 Lawsuit*, Dkt. No. 117.

In his complaint in the instant matter, Delaney claims that there was jurisdictional fraud in the HC2 Lawsuit, because HC2's lawyers "knew what their client paid Delaney, '$67,458.91', but lied to Judge Liman that the amount was over $75,000."  Compl. ¶ 20 n.5.  In addition, HC2's lawyer Rossi stated at the hearing on April 29, 2020, that Delaney made "in the low six figures" from HC2 despite knowing that the correct number was $67,458.91.  *Id.*[5]

### III.    The Bankruptcy Proceeding

On December 23, 2020, Delaney filed for chapter 7 bankruptcy in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Proceeding").  *Id.* ¶ 10; *see In Re Delaney* ("*Bankruptcy Proceeding*"), No. 20-44372 (Bankr. E.D.N.Y. 2020).

#### A.    Delaney's Motion to Dismiss and HC2's Opposition

On March 12, 2021, Delaney filed a motion to dismiss his chapter 7 case.  Compl. ¶ 14.  The Trustee initially verbally agreed with Delaney to the dismissal.  *Id.*  Delaney alleges that the

---

[5] In the HC2 Lawsuit, Delaney similarly moved to dismiss Plaintiff's claims for lack of subject-matter jurisdiction, arguing that the amount in controversy did not exceed $75,000 because the maximum recovery would be what Plaintiff paid Delaney, which was $67,458.91.  *HC2 Lawsuit*, Dkt. No. 100 ¶ 34.  This motion was never adjudicated, because the Court learned that Delaney had filed for bankruptcy.  *HC2 Lawsuit*, Dkt. No. 126.  The HC2 Lawsuit was therefore stayed on February 22, 2021, and remains stayed at the time of this order.

Trustee changed his mind because he was contacted by the Defendants and their attorneys.  *Id.*
¶ 14–16.[6]

On March 15, 2021, Delaney filed an amended schedule and affidavit which included a
nonpriority unsecured claim by HC2 for $67,458.91.[7]  *Bankruptcy Proceeding*, Dkt. No. 17.  The
next day, HC2's counsel Douglas Goldstein filed a notice of appearance in the Bankruptcy
Proceeding.  Compl. ¶ 16.

On March 26, 2021, the Trustee filed an opposition to Delaney's motion to dismiss.  *Id.*
The opposition stated that "[t]he Trustee's investigation also found: (i) four (4) distinct real
property ownership records associated with the Debtor," and that "[t]he Debtor also does not
have only $44,434 in credit card debt as stated on his Motion to Dismiss, but also has a judgment
against him for an additional $67,458.91."  *Id.*; *Bankruptcy Proceeding*, Dkt. No. 22 ¶¶ 11, 16.
The Trustee further stated in reference to the HC2 Lawsuit that "[u]pon information and belief,
the Debtor is appealing a judgment entered against him for extorting his prior employer."
Compl. ¶ 22.  Delaney alleges that the Defendants told the Trustee that Delaney owned four
pieces of real estate, had four undisclosed financial accounts, and had a judgment against him for
extortion in the HC2 Lawsuit.  Compl. ¶ 15.  He states that billing records produced in the
Bankruptcy Proceeding, *see Bankruptcy Proceeding* Dkt. No. 61-5, show the communications
between Defendants and the Trustee.

---

[6] The Trustee had initially filed a Report of No Distribution on February 4, 2021.  *Bankruptcy Proceeding*, Docket Entry of February 4, 2021.  However, on May 8, 2021, before Delaney filed his motion to dismiss, the Trustee filed a rescission, stating that there was an asset to be administered by the estate.  *Bankruptcy Proceeding*, Dkt. No. 14.

[7] Delaney describes this in the Complaint as "HC2's proof of claim."  Compl. ¶ 11 n.1.  However, the schedule was filed by Delaney.  The claim is listed as "contingent" and "disputed," and states that it is a nonpriority unsecured claim resulting from "litigation being dismissed." *Bankruptcy Proceeding*, Dkt. No. 17.

HC2 also filed an opposition to Delaney's motion to dismiss on March 26, 2021. Compl. ¶ 20; *Bankruptcy Proceeding*, Dkt. No. 27. In an attachment to the opposition, Zannikos certified to various facts related to the HC2 lawsuit. Compl. ¶ 22; *Bankruptcy Proceeding*, Dkt. No. 27-1. He certified that "HC2 never terminated the Employment Agreement or took any other action to terminate Delaney's employment by HC2," that "Delaney engaged counsel to demand $450,000 from the Corporate Client," that Delaney's counsel emailed a letter to Toyota "reiterating his demand for a payment and threatening litigation and disclosure of the Corporate Client's privileged and confidential information if his demand was not met by April 14, 2020," and that "[t]he Corporate Client did not capitulate to Delaney's demands or threats." Compl. ¶ 22; *Bankruptcy Proceeding,* Dkt. No. 27-1 ¶¶ 6–8. Plaintiff states that the referenced letter is the one which Judge Liman stated was "a routine demand letter and it's not an extortion," and that the letter did not demand $450,000. Compl. ¶ 22.

On March 25, 2021, in a state court case, Nacchio stated in a sworn affirmation that Delaney had a "scheme to extort a significant payment from the Corporate Client." Compl. ¶ 19.

### B.    Proof of Claim and Adversary Proceedings

On April 6, 2021, HC2 filed a proof of claim for $1,180,152.67. Compl. ¶ 23. Delaney alleges that Goldstein, Nacchio, and Zannikos told the bankruptcy court that the proof of claim of $1.2 million was for attorney's fees and costs from the SDNY proceeding. *Id.* ¶ 23; *see also Bankruptcy Proceeding*, Dkt. No. 63-1 ¶ 5 (describing the Proof of Claim as including $1.1 million in legal fees from the HC2 Lawsuit). HC2 submitted bills in support of the claim, which were mostly for legal fees incurred in connection with applications for the temporary restraining

order and preliminary injunction in the HC2 lawsuit.  Compl. ¶ 23; *Bankruptcy Proceeding*, Dkt. No. 61-5.[8]

On May 20, 2021, Defendants filed an ex parte motion to issue subpoenas duces tecum to Bank of America, E-Trade, Charles Schwab, and Wells Fargo.  Compl. ¶ 28; *Bankruptcy Proceeding*, Dkt. No. 50.  The motion stated that "[t]he Debtor did not disclose in his bankruptcy schedules or Statement of Financial Affairs the existence of any assets, liabilities, closed accounts, depositories for securities or other relationships with any of the Financial Institutions." Compl. ¶ 25; *Bankruptcy Proceeding*, Dkt. No. 50 ¶ 2.  Delaney states that he did not have accounts with any of these financial institutions.  Compl. ¶¶ 25, 28.

HC2 filed an adversary proceeding against Delaney on June 4, 2021.  Compl. ¶ 27, *Bankruptcy Proceeding*, Dkt. No. 54.  The complaint in that proceeding, which was filed by Goldstein, repeated the language from Zannikos's certification in opposition to Delaney's motion to dismiss characterizing Delaney's letter to Toyota as demanding payment and threatening litigation. Compl. ¶ 27.[9]  Similarly, in an affidavit of June 16, 2021, Zannikos stated that "Delaney engaged counsel to demand $450,000 directly from the Corporate Client," that "[i]n [the letter], Delaney's lawyer threatened to commence legal action and publicly disclose such confidential and privileged information about the Corporate Client [Toyota] that Delaney had

---

[8] HC2 claimed that Delaney's Employment Agreement required him to indemnify HC2 for reasonable attorney's fees resulting from his breach of the agreement.  *HC2 Lawsuit*, Dkt. No. 1 ¶ 44; *Bankruptcy Proceeding*, Dkt. No. 61-5 ¶¶ 8, 25.

[9] Specifically, it repeated that "HC2 never terminated the Employment Agreement or took any other action to terminate Delaney's employment by HC2," that "Delaney engaged counsel to demand $450,000 from the Corporate Client," and that Delaney's counsel emailed a letter to Toyota "reiterating his demand for a payment and threatening litigation and disclosure of the Corporate Client's privileged and confidential information if his demand was not met by April 14, 2020."  Compl. ¶ 27.

obtained during the Project if Delaney's demand was not met by the next day," and that "[t]he

Corporate Client [Toyota] did not pay Delaney's $450,000 demand."  Compl. ¶ 29.[10]

### C.    Agreement to Withdraw Proof of Claim

On July 19, 2021, HC2 filed a motion to withdraw its proof of claim. Compl. ¶ 36; *see*

*Bankruptcy Proceeding*, Dkt. No. 76.  The motion states that "after the July 15 conference, HC2

determined that it no longer wishes to prosecute Claim 2 or the Cross-Motion, or defend against

the Objection, or otherwise seek allowance of a pre-petition claim against Delaney or the

bankruptcy estate."  Compl. ¶ 36; *Bankruptcy Proceeding*, Dkt. No. 75 ¶ 11.[11]  Delaney

consented to the withdrawal of the claim "in reliance on HC2's stipulations and representations

to the bankruptcy court."  Compl. ¶ 37.  Specifically, HC2's lawyer Goldstein emailed Delaney

"to reach an agreement with him not [to] oppose their motion to withdraw their proof of claim in

exchange for their exiting the case with prejudice."  *Id.* ¶ 76.

Judge Mazer-Marino granted the request to withdraw the claim on August 1, 2021.

Compl. ¶ 38.  The order stated that "Claim 2 of HC2 is hereby withdrawn, with prejudice to

HC2's right to file another proof of claim in this bankruptcy case."  Compl. ¶ 38; *Bankruptcy*

*Proceeding*, Dkt. No. 83.

---

[10] Delaney filed discovery requests and deposition notices in the Bankruptcy Proceeding which
sought to gain information about the alleged jurisdictional fraud in the HC2 Lawsuit.  Compl.
¶ 31.  Delaney states that on July 12, 2021, Goldstein filed a request for a hearing to quash the
depositions of the witnesses and/or limit the questions to matters so that Delaney could not
inquire about jurisdictional fraud.  *Id.* ¶ 33.  Delaney states that he opposed the letter, and Judge
Jil Mazer-Marino of the United States Bankruptcy Court for the Eastern District of New York
denied Goldstein's request.  Compl. ¶ 35.  Court records show that Delaney sought to take
depositions, that Goldstein made certain objections and requested a conference, that Delaney
opposed the letter, and that a conference was held on July 15, 2021.  *Bankruptcy Proceeding*,
Dkt. Nos. 72–73.
[11] The motion additionally states that "HC2 seeks to withdraw Claim 2 because the likely cost to
defend against the Objection, including legal fees and expenses and expected interruptions to
HC2's business, far exceeds the value of any potential benefit to it."  *Bankruptcy Proceeding*,
Dkt. No. 76 ¶ 22.

On November 24, 2021, Delaney again moved to voluntarily dismiss the bankruptcy case. Compl. ¶ 40. On December 6, 2021, HC2 filed an objection to the motion to dismiss as an interested party. *Id.* ¶ 41; *Bankruptcy Proceeding*, Dkt. No. 125.[12]

### IV.    Additional Allegations

Delaney alleges that starting in March 2022, he "engaged in the protected activity of complaining to the government about HC2's failing to furnish him with a copy of the Summary Plan Description in violation of the Employee Retirement Income Security Act of 1974 ("ERISA") and the labor laws and ignored his letters to the company about when he would receive a payment of $2,000 or other amount to which the Social Security Administration informed him he was entitled." Compl. ¶ 44. Delaney claims that subsequently, on July 21, 2022, the plaintiffs retaliated against him by having Goldstein appear at the bankruptcy hearing to oppose Delaney's voluntary dismissal of the bankruptcy case. *Id.* ¶ 45.

Further, Delaney contends that on April 12, 2023, in a Florida defamation case initiated by Delaney's former lawyer against Zannikos and others, TMNA's law firm WilmerHale stated that Delaney "is appealing a judgment entered against him for extorting his former employer." *Id.* ¶ 46.

Finally, Delaney claims that the Defendants retaliated against him by giving negative references. *Id.* ¶ 110.

---

[12] HC2 asserted that its interest was as a party to a settlement it entered into with the Trustee on October 6, 2021, which had released HC2 from certain claims. *Bankruptcy Proceeding*, Dkt. No. 125 ¶ 2. Specifically, on October 6, 2021, the Bankruptcy Court entered an order approving a settlement between the Trustee and HC2. *Bankruptcy Proceeding*, Dkt. No. 116. In that settlement, HC2 paid the estate $25,000 in exchange for a release of the "Pre-Petition Claims," defined to include Delaney's counterclaims against HC2 in the HC2 lawsuit, a related motion for sanctions, and a complaint filed by Delaney against HC2 in New York state court. *Id.*

## PROCEDURAL HISTORY

Plaintiff filed a summons and complaint in the Supreme Court of New York, New York County, on August 5, 2024.  Dkt. No 1 ¶ 1.  That complaint asserted claims solely under state law.  *See* Dkt. No. 1-1.  Plaintiff filed an amended complaint and a corrected amended complaint on August 18, 2024.  *Id.* ¶¶ 2–3.  The corrected amended complaint, which is the operative complaint in this case, asserted claims for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*  Compl. ¶¶ 99–113.  Defendant TMNA removed the action to this court on August 20, 2024.  Dkt. No. 1.[13]  The case was referred to the undersigned as related to the HC2 Lawsuit.

On August 26, 2024, the HC2 Defendants filed a motion to dismiss, memorandum of law, and declaration of counsel with two exhibits.  Dkt. Nos. 7–9.  On September 9, 2024, TMNA filed a motion to dismiss, memorandum of law, and declaration of counsel with two exhibits.  Dkt. Nos. 20–22.[14]  Plaintiff, proceeding pro se, filed a memorandum of law in opposition to HC2's motion on September 11, 2024, Dkt. No. 22, and a memorandum of law in opposition to TMNA's motion on the same day, Dkt. No. 24.  The HC2 Defendants submitted a reply memorandum of law and accompanying affirmation of counsel on September 16, 2024.  Dkt. No.

[13] The HC2 Defendants had not been served with the Complaint at that time.  Dkt. No. 5. Nevertheless, they filed a notice of consent to removal.  *Id.*

[14] Prior to this filing, on September 6, 2024, Plaintiff filed proposed Clerk's certificates of default against TMNA.  Dkt. No. 13.  TMNA responded that it was not in default, and each party submitted an additional letter regarding the proper application of Federal Rule of Civil Procedure 81 to these facts.  Dkt. Nos. 14, 17, 19.  On September 13, 2024, the Court issued an order holding that TMNA had twenty-one days after the operative complaint was filed to answer, and therefore was not in default on September 6, 2024.  Dkt. No. 31.  The Court also stated that if default had been entered, it would have set aside the entry of default for good cause shown.  *Id.* at 8.  Plaintiff moved for reconsideration of this order on September 15, 2024, Dkt. Nos. 37, 38, 40, which the Court denied, Dkt. No. 41.

34–35.  TMNA submitted a reply memorandum of law and accompanying declaration of counsel on September 25, 2024.  Dkt. No. 48–49.

Plaintiff's memoranda in opposition to the motions to dismiss argued, among other things, that both motions to dismiss should be stricken or denied because the defendants "did not serve their motion to dismiss on the plaintiff," noting that "[t]he plaintiff does not receive ECF filings in this case."  Dkt. No. 22 ¶ 9; Dkt. No. 24 ¶ 13–15.  In response, counsel for the HC2 Defendants filed an affirmation stating that he had served the motion to dismiss and related documents on Plaintiff via email on August 26, 2024, by priority international mail on August 27, 2024, and by FedEx on September 11, 2024.  Dkt. No. 29.  Plaintiff objected to this affirmation on the grounds that it was untimely and not proper proof of service, given that as a resident of the Philippines he needed to be served pursuant to the Hague Convention.  Dkt. No. 30.  TMNA filed a letter stating that it had served Plaintiff by email and by FedEx, as noted at Dkt. No. 23.  Dkt. No. 32.  TMNA also requested that it be permitted to serve Plaintiff by email, a request joined by the HC2 Defendants.  Dkt. Nos. 32, 33.  Plaintiff then submitted a letter responding to TMNA's letter and arguing that alternative service is not proper.  Dkt. No. 36, 39.  HC2's counsel submitted an additional affirmation on September 19, 2024, which stated in substance that Plaintiff refused delivery of the documents sent by FedEx on September 11, 2024.  Dkt. No. 42.  Plaintiff moved to strike the September 19, 2024, affirmation, the HC2 Defendants' reply memorandum of law, and the accompanying affirmation of counsel, on the grounds that these documents were untimely.  Dkt. No. 43.  Plaintiff then moved to strike TMNA's reply memorandum of law and the accompanying declaration of counsel for the same reason.  Dkt. No. 50.  TMNA opposed the motion to strike.  Dkt. Nos. 52–53.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002), *cert. denied*, 537 U.S. 1089 (2002). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The ultimate question is whether "[a] claim has facial plausibility, [i.e.] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556.

In considering a Rule 12(b)(6) motion, the court generally reviews only "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Concord Assocs*, 817 F.3d at 51 n.2. Incorporation by reference requires "a clear, definite and substantial reference to the documents." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 331 (S.D.N.Y. 2003)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies

heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). "[E]ven if a document is 'integral' to the complaint," however, a court may not consider it if a "dispute exists regarding the authenticity or accuracy of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

The Court generally construes pro se pleadings broadly and liberally, interpreting them so as to raise the strongest arguments they suggest. *See Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007); *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000). However, "a lawyer representing himself ordinarily receives no such solicitude at all." *Woodhouse v. Meta Platforms, Inc.*, 2024 WL 4297471, at *1 (2d Cir. Sept. 26, 2024) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 101, 102 (2d Cir. 2010)).

## DISCUSSION

### I.    Service and Timeliness

As a threshold issue, the Court must determine whether the motions to dismiss and related documents should be stricken due to improper service or untimeliness. Service of papers subsequent to the initial complaint is governed by Federal Rule of Civil Procedure 5. *See* Fed. R. Civ. P. 5. Under Federal Rule of Civil Procedure 5, a paper may be served by, *inter alia*, "mailing it to the person's last known address—in which event service is complete upon mailing" or "sending it to a registered user by filing it with the court's electronic-filing system." Fed. R. Civ. P. 5(b)(2)(C), (E). The requirements of Rule 5 are much less stringent than the requirements for service of process under Rule 4. *See* Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1141 (4th ed. 2022) ("The comparative absence of litigation under Rule 5 can be attributed to a combination of the relative ease of compliance with the rule.").

Relevant here, although Plaintiff argues that service must comply with the Hague Convention, Dkt. No. 30, courts in this District have held that "the Hague Service Convention only applies to the initial service of process, namely the summons, not subsequent judicial documents," *S.E.C. v. Credit Bancorp, Ltd.,* 2011 WL 666158, at *4 (S.D.N.Y. Feb. 14, 2011), *aff'd sub nom. S.E.C. v. Blech*, 501 F. App'x 74 (2d Cir. 2012); *see In re Advance Watch Co., Ltd*., 587 B.R. 598, 604–05 (Bankr. S.D.N.Y. 2018).

Here, Defendants mailed the papers to Plaintiff's last known address, a proper means of service under Rule 5(b)(2)(C). *See* Dkt. Nos. 23, 29. Moreover, even assuming that this was not a proper means of service, Defendants also sent the documents to Plaintiff by filing them with the court's electronic-filing system. *See* Fed. R. Civ. P. 5(b)(2)(E). Although Plaintiff states that he "does not receive ECF filings in this case," Dkt. Nos. 22, 24, Plaintiff is a former attorney admitted to practice in the Southern District of New York and at the time of the relevant filings was a registered user of the electronic filing system. The docket indicates that, in fact, Plaintiff's opposition memoranda, in which he first stated he did not receive ECF filings, were filed via ECF on September 11, 2024. On September 14, 2024, Plaintiff emailed the S.D.N.Y. Attorney Services office stating that he is retired from the practice of law, and that his admission to practice in this Court and corresponding ECF access should be revoked. Plaintiff then filed a letter with the Court dated the next day, September 15, 2024, stating that "[t]he United States District Court for the Southern District of New York does not allow e-filing by non-attorneys and I have not received any e-filings in this case." Dkt. No. 39. This suggests that Plaintiff has not been candid regarding purported service issues. Moreover, the record clearly shows that Plaintiff had actual and prompt notice of the motions and other documents, as he responded to a

several motions and letters within a day or two of their filing.  *See, e.g.*, Dkt. Nos. 30, 39, 40, 43.
The motions to dismiss will not be stricken or denied for improper service.

     Defendants' reply memoranda of law and associated affirmations will also not be stricken
for untimeliness or other impropriety, as urged by Plaintiff.  Dkt. Nos. 43, 50.  Though
Defendant cites the time limits in Local Rule 6.1(a), Dkt. No. 43, the proper time limits for a
motion to dismiss are found in Local Rule 6.1(b).  Because this rule allows a reply to be served
within seven days of service of the answering papers, the HC2 Defendants' reply at Dkt. No. 34
is clearly timely.[15]  Although TMNA's reply was filed more than seven days after Plaintiff's
opposition, TMNA states that it was following the undersigned's Individual Practices for pro se
cases, which sets a reply deadline of fourteen days.  Dkt. No. 52 (citing Individual Rule 2(K)).
This rule was not intended to afford additional time to a represented defendant when the pro se
plaintiff is a lawyer receiving ECF filings and timely following the schedule set out in Local
Rule 6.1.  However, as Plaintiff has repeatedly invoked his pro se status, he will not be heard to
argue that the rule does not apply, and TMNA may not be penalized for following it.  TMNA's
reply memorandum is timely.

## II.    Plaintiff's Causes of Action

     Plaintiff's Complaint pleads seven causes of action: 1) violation of N.Y. Judiciary Law
§ 487, 2) conspiracy to violate the same statute, 3) negligent infliction of emotional distress, 4)
breach of contract and stipulation, 5) violation of N.Y. Labor Law § 740, 6) employment

---

[15] The affirmation at Dkt. No. 42 is also proper, despite Plaintiff's argument that it should be
stricken as an untimely "reply."  Dkt. No. 43.  The affirmation, which includes the updated
information that Plaintiff has refused service by FedEx, is best construed not as a second reply to
Plaintiff's opposition but as a response to his letter at Dkt. No. 39 stating that "I have not evaded
service nor would I have any reason to do so."  The barrage of letters from all parties regarding
the proper method of service on Plaintiff, though related to arguments made in Plaintiff's
opposition, is not a series of untimely filings on motions but a largely independent dispute.

discrimination in violation of the ADA, and 7) retaliation in violation of Title VII. *See* Compl.

¶¶ 48–113.  HC2 and TMNA argue that each of Delaney's causes of action should be dismissed

for failure to state a claim.  Dkt Nos. 8, 22.  TMNA additionally argues it cannot be liable for

many of Plaintiff's claims because it is not Plaintiff's employer and is not associated with the

relevant allegations.  Dkt. No. 22.

### A.    New York Judiciary Law § 487

Under New York Judiciary Law § 487, "an attorney and counselor who . . . [i]s guilty of

any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or

any party . . . is guilty of a misdemeanor" and may be liable to the injured party for treble

damages in a civil action.  N.Y. Judiciary Law § 487.  This statute, which has been on the books

virtually unchanged since the 1700s, "creates a cause of action for attorney deceit that is distinct

from common law fraud or legal malpractice."  *Urias v. Daniel P. Buttafuoco & Assocs., PLLC*,

238 N.E.3d 836, 840 (N.Y. 2024).  "[T]he purpose of Judiciary Law § 487(1) is to safeguard an

attorney's special obligation of honesty and fair dealing in the course of litigation."  *Bill Birds,*

*Inc. v. Stein L. Firm, P.C.*, 149 N.E.3d 888, 891 (N.Y. 2020).  It therefore covers not all attorney

conduct, but specifically conduct that occurs "in the context of 'an action pending in a court,'"

"with the intent to mislead the court or a party."  *Id.* at 891 (quoting *Looff v. Lawton*, 97 N.Y.

478, 482 (1884)).  In keeping with the partially criminal nature of the statute, the statute covers

actions done with intent to deceive even if the deceit is not successful.  *Amalfitano v. Rosenberg*,

903 N.E.2d 265, 268–69 (N.Y. 2009).

The statute "guards against false statements by lawyers during litigation, rising to the

level of intentional deceit or collusion; it was not designed to curtail attorneys' expressions of

views concerning what the law is or should be, nor does it include merely poor lawyering,

negligent legal research or the giving of questionable legal advice."  *Bill Birds*, 149 N.E.3d at

893.  This is again in keeping with the partly criminal nature of the statute, which requires a court to ensure "that penal responsibility is not extended beyond the fair scope of the statutory mandate."  *Id.* at 891 (quoting *People v. Hedgeman*, 517 N.E.2d 858, 860 (N.Y. 1987)).

Delaney alleges three categories of attorney deceit that occurred during the bankruptcy proceeding. He claims that Zannikos and Nacchio 1) made false statements to Delaney's bankruptcy trustee and the trustee's lawyers that his demand letter was extortionate and that "Judge Liman had issued a judgment against Delaney for extortion," 2) "filed a false proof of claim," and 3) "instructed Goldstein to continue to appear at hearings in Delaney's bankruptcy case even after HC2 had been ordered to withdraw from the case with prejudice on August 1, 2021."  Compl. ¶¶ 53–55.

The HC2 Defendants contend that this statute is not applicable to conduct in federal courts and that Plaintiff waived his Section 487 claim by failing to raise it in the Bankruptcy Proceeding.  Dkt. No. 8 at 14–17.  The HC2 Defendants are incorrect that Plaintiff waived his claim by not raising it in the underlying proceeding.  *See Hong v. Mommy's Jamaican Mkt. Corp.*, 2024 WL 3824394, at *22 (S.D.N.Y. Aug. 14, 2024) ("[C]laims under § 487 must be brought as an action, not by motion."); *Urias*, 238 N.E.3d at 840–42 ("We conclude that section 487 must be read to allow a plenary action for deceit, even where success on that claim might undermine a separate final judgment.").  However, whether Section 487 applies to federal courts raises an open question of statutory interpretation.

### 1.    Application of Section 487 to Federal Courts

The Second Circuit has held that Judiciary Law § 487 does not reach attorney conduct in proceedings, whether state or federal, "outside New York's territorial borders."  *Schertenleib v. Traum*, 589 F.2d 1156, 1166 (2d Cir. 1978).  But *Schertenleib*, which concerned attorney conduct related to proceedings in Switzerland, did not speak to whether Section 487 was

applicable to federal proceedings within New York's territorial borders.  *See id.*  Some courts

have read the reasoning of *Schertenleib*, which states that the statute is concerned with "the

integrity of the truth-seeking processes of the New York courts," to imply that the statute does

not apply to federal proceedings.  *Id.*; *see In re Reeves*, 2023 WL 8607128, at *5–7 (Bankr.

S.D.N.Y. Dec. 12, 2023) ("Section 487 only extends to attorney misconduct in connection with

state court actions."); *All. Network, LLC v. Sidley Austin LLP*, 987 N.Y.S.2d 794, 806 (N.Y. Sup.

Ct. 2014).  However, other courts have held that Section 487 claims based on federal

proceedings are cognizable.  *See Cinao v. Reers*, 893 N.Y.S.2d 851, 857–59 (N.Y. Sup. Ct.

2010); *see also In re Blue Dog at 399 Inc.*, 2020 WL 6390674, at *7 (Bankr. S.D.N.Y. Oct. 30,

2020) (noting that the New York Court of Appeals decision in *Bill Birds*, 149 N.E.3d 888,

dismissed a Section 487 claim based on federal litigation but "did not express any concern with

the fact that the underlying litigation had proceeded in federal court in New York").  The plain

language of the statute does not clarify the issue.  It states simply that the statute covers attorney

deceit or collusion "with intent to deceive the court or any party," without clarifying whether

"the court" refers to a New York state court or any court located within New York.  N.Y.

Judiciary Law § 487(1).

A court interpreting a New York statute must "look to the purpose of the enactment and

the objectives of the Legislature," "interpret[ing] a statute so as to avoid an unreasonable or

absurd application of the law."  *Lubonty v. U.S. Bank Nat'l Ass'n*, 139 N.E.3d 1222, 1225 (N.Y.

2019) (quoting *People v. Garson*, 848 N.E.2d 1264, 1270 (N.Y. 2006)).  Moreover, "a statute

should be construed, whenever possible, in a way that avoids placing its constitutionality in

doubt."  *People v. Viviani*, 169 N.E.3d 224, 232 (N.Y. 2021).  Because both Congress and the

federal courts themselves have authority to regulate proceedings in the federal court, and because

application of Judiciary Law § 487 creates the potential for conflict with the already robust regulatory regime that governs attorney conduct in federal court, the most reasonable interpretation of Judiciary Law § 487 is that it applies only to state court proceedings. *See SGM Holdings LLC v. Andrews*, 2024 WL 3674820, at \*9–25 (S.D.N.Y. Aug. 2, 2024) (holding that Section 487 does not apply to attorneys "who were never admitted to the New York Bar and whose alleged misconduct took place only before a federal court").

The original version of Judiciary Law § 487 dates to 1787, before the federal courts were created, making it difficult to determine any clear legislative intent as to whether the provision would apply to such courts. *See Amalfitano*, 903 N.E.2d at 267; *SGM Holdings*, 2024 WL 3674820, at \*23. However, both New York and federal courts have stated that the purpose of the statute is to "safeguard[] the integrity of the judicial system." *Urias*, 238 N.E.3d at 840; *see Schertenleib*, 589 F.2d at 1166; *Bill Birds*, 149 N.E.3d at 891 ("[T]he purpose of Judiciary Law § 487(1) is to safeguard an attorney's special obligation of honesty and fair dealing in the course of litigation."). New York's interest in protecting the integrity of its own judicial system is significant. By contrast, its interest in protecting the integrity of a federal court which happens to be located in New York state is minimal. *See SGM Holdings*, 2024 WL 3674820, at \*10.

The legislature's choice to site the current version of the provision in the Judiciary Law also suggests a focus on the state court system. *See id.* at \*23–25. Nearly every Article of the Judiciary Law speaks to the organization and management of the state court system, from the constitution of courts and appointment of judges to the selection of jurors and use of criers, interpreters, and stenographers. *See, e.g.*, N.Y. Judiciary Law Art. 2, 8–9, 11–12, 16. Clearly, none of these provisions would apply to a federal court. Section 487 is contained in Article 15, Attorneys and Counsellors, which focuses mainly on admission to the bar, unauthorized practice

of law, and related issues of attorney ethics.  *See* N.Y. Judiciary Law §§ 460–468, 476a, 478, 495, 498.  These provisions accord with the traditional state concern for "maintaining standards among members of the licensed professions," which is unquestionably proper.  *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 460 (1978).  However, they do not suggest any concern with the integrity of federal court proceedings, as opposed to the integrity of the state bar more generally. In the context of the Judiciary Law, the purpose of "safeguarding the integrity of the judicial system," *Urias*, 238 N.E.3d at 840, most naturally refers to the integrity of the state judicial system.

Moreover, and importantly, it is unreasonable to read Judiciary Law § 487 as a regulation on attorney deceit in federal court given the clear federal interest in regulating such behavior and the extensive and carefully-balanced federal scheme in place to do so.  A federal court may impose sanctions for attorney misconduct pursuant to Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the court's inherent power.  Rule 11 states that by presenting papers to the court, an attorney certifies that the paper "it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," and that the factual contentions have evidentiary support or are likely to have such support after further investigation.  Fed. R. Civ. P. 11(b).  "[T]he standard for triggering the award of fees under Rule 11 is objective unreasonableness."  *Margo v. Weiss*, 213 F.3d 55, 65 (2d Cir. 2000). Section 1927 of Title 28 states that the court may require an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously" to personally satisfy the costs and attorney's fees reasonably incurred because of such conduct.  28 U.S.C. § 1927.  The court must find that "(1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, motivated by improper purposes such as harassment or delay."

*Huebner v. Midland Credit Mgmt., Inc*., 897 F.3d 42, 55 (2d Cir. 2018) (quoting *Kim v. Kimm*,

884 F.3d 98, 106 (2d Cir. 2018)).  Similarly, "[a] court may also sanction a litigant pursuant to

its inherent authority 'if there is clear evidence that the [litigant's] conduct' was '(1) entirely

without color and (2) motivated by improper purposes.'"  *Id.* at 56 (quoting *Wolters Kluwer Fin.*

*Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009)).[16]  Fraud on the court necessarily

involves conduct that is not legally or factually supportable and motivated by improper purposes,

and "a court can impose sanctions under its inherent authority when it finds fraud on the court."

*Hong*, 2024 WL 3824394, at *13; *see N.Y. Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy,*

*Inc*., 432 F. App'x 25 (2d Cir. 2011).

    Sanctions for each of these purposes are carefully limited to provide proper process for

attorneys and "so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of

the law."  *Hong*, 2024 WL 3824394, at *13 (quoting *(RC) 2 Pharma Connect, LLC v. Mission*

*Pharmacal Co.,* 2022 WL 4234552, at *5 (S.D.N.Y. Sept. 14, 2022)).  Under Rule 11, before a

motion for sanctions can be filed, the attorney must be given 21 days to withdraw or correct the

challenged paper.  Fed. R. Civ. P. 11(c)(2).[17]  Sanctions for a violation "must be limited to what

suffices to deter repetition of the conduct or comparable conduct by others similarly situated."

Fed. R. Civ. P. 11(c)(4).  A typical sanction is "payment of the other side's reasonable attorney's

fees which were incurred as a result of the improper filing" or the payment of a penalty to the

---

[16] "The only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is . . . that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both."  *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986).

[17] If the Court imposes Rule 11 sanctions *sua sponte*, it must make a finding of bad faith.  *See Kyros L. P.C. v. World Wrestling Ent., Inc*., 78 F.4th 532, 543–44 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 822 (2024).

court.  *Wood v. Brosse U.S.A., Inc.*, 149 F.R.D. 44, 52 (S.D.N.Y. 1993); *see* Fed. R. Civ. P. 11(c)(4).  Sanctions may not be used as a substitute for tort damages, and must be used to "deter improper behavior, not to compensate the victims of it or punish the offender."  *Universitas Educ., LLC v. Nova Grp., Inc.*, 784 F.3d 99, 103 (2d Cir. 2015) (quoting Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1336.3 (3d ed. 2004)).  Although Rule 11 sanctions may involve the payment of a penalty for deterrence rather than compensation, such payment must be only what is necessary to deter the conduct, and "a court should impose the least severe sanctions necessary to achieve the goal."  *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 465 (S.D.N.Y. 2023) (quoting *(RC) 2 Pharma Connect, LLC v. Mission Pharmacal Co.*, 2023 WL 112552, at *3 (S.D.N.Y. Jan. 4, 2023)).

When sanctions are awarded pursuant to a court's inherent power, the sanction "must be compensatory rather than punitive in nature."  *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017).  To level a punitive sanction, "a court would need to provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof."  *Id.*; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process.").

On its face and leaving aside the question of to which "court" it applies, Judiciary Law § 487 serves the same aim as the federal rules, federal statute, and the power entrusted by the Constitution to the federal courts themselves: "safeguarding the integrity of the judicial system." *Urias*, 238 N.E.3d at 840.  But it provides an entire different and incompatible manner of addressing this conduct.  When an attorney perpetrates fraud on the court, the federal scheme is to address this through compensatory or deterrent sanctions, avoiding due process concerns and

potential overdeterrence that could chill vigorous advocacy and flow from punitive regulation.

New York has chosen to address such conduct through a statute that is expressly punitive, rooted

in criminal sanctions and treble damages. *See Amalfitano*, 903 N.E.2d at 269 ("[T]he more

appropriate context for analysis is not the law applicable to comparable civil torts but rather

criminal law."); *Cox v. Microsoft Corp.*, 737 N.Y.S.2d 1, 2 (1st Dep't 2002) ("It has long been

recognized that a provision for the trebling of damages is penal and subject to strict

construction."). This is an approach which has expressly been avoided by the Federal Rules,

which have been carefully framed to properly deter serious misconduct without creating an

avenue to "exact an unjust settlement, to intimidate an adversary into withdrawing contentions

that are fairly debatable, [or] to increase the costs of litigation." Fed. R. Civ. P. 11, advisory

committee notes to 1993 amendment.

Although the principle that "[c]ourts must 'harmonize the various provisions of related

statutes and [] construe them in a way that renders them . . . compatible'" is often invoked with

respect to multiple state statutes, it has even greater force as applied to state and federal statutes,

where incompatibility would raise constitutional concerns. *People ex rel. McCurdy v. Warden,*

*Westchester Cnty. Corr. Facility*, 163 N.E.3d 1087, 1091 (N.Y. 2020) (quoting *Matter of*

*Dutchess Cnty. Dept. of Soc. Servs. v. Day*, 749 N.E.2d 733, 736 (N.Y. 2001)); *see Viviani*, 169

N.E.3d at 232. The logical way to construe Judiciary Law § 487 is that such law applies to fraud

on a state court, and the federal scheme applies to fraud on a federal court. This is in keeping

with the interest of each sovereign in creating its own scheme to "safeguard[] the integrity of the

judicial system" according to its own view of how to balance the value of vigorous advocacy

against the need for protection of courts and litigants. *Urias*, 238 N.E.3d at 840. It would be

unreasonable to construe Judiciary Law § 487 as applicable to an attorney's efforts to deceive a

federal court, creating direct conflicts with Rule 11 and 28 U.S.C. § 1927 and introducing constitutional concerns when such concerns are easily avoided.

Such an interpretation would also lead to absurd results inconsistent with the federal judicial scheme. The federal judicial power does not fundamentally depend on the location where that power is exercised. *See Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167–68 (1939) ("The jurisdiction of the federal courts—their power to adjudicate—is a grant of authority to them by Congress and thus beyond the scope of litigants to confer. But the locality of a law suit—the place where judicial authority may be exercised—though defined by legislation relates to the convenience of litigants and as such is subject to their disposition."). Thus "[o]ne of the shaping purposes of the Federal Rules is to bring about uniformity in the federal courts," such that an attorney filing in one federal jurisdiction is not subject to different requirements from an attorney filing in another. *Hanna v. Plumer*, 380 U.S. 460, 471 (1965). But if Section 487 were to apply to federal proceedings, an attorney who filed a purportedly false pleading in the Southern District of New York could be haled into state court on threat of criminal sanctions and treble damages, while an attorney who filed the same pleading in another state (or had his case transferred there) would be subject only to the standard sanctions of Rule 11. It cannot be assumed that ambiguous state legislation is intended to subvert a uniform federal scheme. *Cf. Gobeille v. Liberty Mut. Ins. Co*., 577 U.S. 312, 320–23 (2016) (noting when federal "systems and procedures are intended to be uniform," state laws disrupting this uniformity are likely to be preempted).

No contrary conclusion can be drawn from the fact that some state torts and regulations touch on attorney behavior related to federal court proceedings. As already noted, it is well-recognized that New York may discipline or disbar an attorney for conduct before a federal court

as part of its responsibility to "maintain[] standards among members of the licensed professions."

*Ohralik*, 436 U.S. at 460; *see Schertenleib*, 589 F.2d at 1166. In addition, the state tort of legal

malpractice is clearly applicable to attorneys practicing in federal court, and "unlawful

interference with a person or property under the color of" federal process may give rise to the

tort of abuse of process. *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 106–07 (S.D.N.Y. 2020)

(quoting *Williams v. Williams*, 246 N.E.2d 333, 335 (N.Y. 1969)); *see Gunn v. Minton*, 568 U.S.

251, 259 (2013) (explaining that "state legal malpractice claims based on underlying patent

matters" are properly heard in state court).[18]  Certain provision of the Judiciary Law, such as the

champerty statute, N.Y. Judiciary Law § 489, have similarly been applied in connection with

litigation in federal court. *See, e.g.*, *Lateral Recovery LLC v. Funderz.net, LLC*, 2024 WL

4350369, at *16 (S.D.N.Y. Sept. 27, 2024).

     However, Section 487 is unlike these forms of regulation in that it directly targets

attorney deceit within a court proceeding. *See Bill Birds*, 149 N.E.3d at 891 (holding that the

statute only applies "in the context of an action pending in court"). Torts such as legal

malpractice and abuse of process, although potentially connected to federal court proceedings,

fundamentally concern the relationship between the lawyer and his client or other members of

the public. *See Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004) ("[L]egal malpractice is a

---

[18] Some courts have suggested that Rule 11 preempts the entire field of claims regarding abusive litigation in federal court, including abuse of process. *See Great W. Bank v. Se. Bank*, 507 S.E.2d 191, 194 (Ga. 1998) (citing federal cases); *SGM Holdings*, 2024 WL 3674820, at *16. However, the advisory committee notes suggest this was not intended. *See* Fed. R. Civ. P. 11, advisory committee notes to 1993 amendment ("Rule 11 does not preclude a party from initiating an independent action for malicious prosecution or abuse of process."); *see also U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383 (3d Cir. 2002) ("[T]he Federal Rules of Civil Procedure do not preempt claims for abuse of process and similar torts providing relief for misconduct in federal litigation."); *Graber v. Fuqua*, 279 S.W.3d 608 (Tex. 2009) ("In general, federal law does not preempt a state malicious prosecution claim predicated on conduct occurring in standard federal civil actions.").

species of negligence."); *SGM Holdings*, 2024 WL 3674820, at *15 ("Abuse of process is thus a typical tort in the sense that it forbids intentionally injuring another.").  Similarly, New York's attorney disciplinary process is not primarily focused on the relationship between the attorney and the court but on "protection of the public." *Levy v. Ass'n of the Bar of City of N. Y.*, 333 N.E.2d 350, 352 (1975).  Regulating the relationship between attorneys and the public fits comfortably within a state's police powers.  *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 635 (1995) ("[T]he standards and conduct of state-licensed lawyers have traditionally been subject to extensive regulation by the States."); *Custer v. Sweeney*, 89 F.3d 1156, 1167 (4th Cir. 1996) ("[T]he law governing legal malpractice represents a traditional exercise of state authority.").

Section 487 does not.  The primary behavior the statute seeks to regulate is not conduct between private citizens, but deceit "in any court of justice." *Bill Birds*, 149 N.E.3d at 890 (quoting the original 1787 statute).  Although the modern version of the statute provides a private cause of action, its purpose is not to compensate losses but to punish attorneys who violate their obligations as "officers of the court." *Id.* at 891.  Thus, the statute is much more akin to a sanction, aimed at punishing the attorney for misbehavior in court, than a tort, aimed at regulating the relationship between private parties.  Although New York can comfortably regulate the relationship between attorneys and the public, or between attorneys and its own courts, the same does not apply to the relationship between New York attorneys and a federal court.  The relationship between an attorney and court closely implicates a court's "inherent powers . . . to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases," including by "fashion[ing] an appropriate sanction for conduct which abuses the judicial process." *Goodyear*, 581 U.S. at 107 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962) and quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)).  These powers of a

federal court are properly supplemented by federal statute, but cannot be controlled by a New York statute. The fact that New York can properly regulate attorney behavior in other ways does not mean it can regulate the conduct that occurs in a federal court. It is for the court in which the misconduct occurs to decide the proper sanction within the limits set out by federal law. Because Section 487 is specifically directed to misconduct in courts, and misconduct in federal courts is not within the reach of the statute, it must be directed towards misconduct in New York courts.[19]

An argument has been offered that Section 487 could reach conduct in federal courts of attorneys admitted to New York bar, but not other attorneys, due to the state interest in regulating members of its bar. *See SGM Holdings*, 2024 WL 3674820, at *17 n.23. But while the Second Circuit has stated that New York may properly "impose disciplinary sanctions against New York attorneys" who are members of the bar, it also noted that "section 487 is not an exercise of that power, but is rather intended to regulate, through criminal and civil sanctions, the conduct of litigation before the New York courts." *Schertenleib*, 589 F.2d at 1166. Thus the state interest in "maintaining standards among members of the licensed professions" is served not by regulating attorneys via Section 487, but by instituting attorney disciplinary proceedings. *Ohralik*, 436 U.S. at 460. Moreover, the words "an attorney or counselor" in Section 487 in no

---

[19] Because Section 487 forbids deceiving the court "or any party," a violation need not involve filing false papers or perpetrating a fraud on the court. *See, e.g.*, *Garanin v. Hiatt*, 195 N.Y.S.3d 511, 513 (2d Dep't 2023) (Section 487 claim based on attorney serving a falsified legal document on an opposing party); *Mackley v. Sullivan & Liapakis, P.C.*, 1999 WL 287362, at *3 (S.D.N.Y. May 7, 1999) (Section 487 claim based on attorney deception of a client). In certain applications to the deception of parties, the statute is more akin to torts such as legal malpractice or abuse of process. However, there is no textual basis to apply the statute piecemeal to the deception of parties in federal proceedings, but not to the deception of courts. Nor is there any basis for applying the statute in one manner to federal proceedings and in another manner to state proceedings. The statutory reference to "the court and any party" either applies to federal courts and parties, or it applies only to state courts and parties. N.Y. Judiciary Law § 487.

way suggest a limitation to New-York-barred attorneys, nor would it be consistent with

protecting "the integrity of the truth-seeking processes of the New York courts," *Schertenleib*,

589 F.2d at 1166, to exempt attorneys practicing pro hac vice in such courts from the prohibition

on attorney deceit.  The better interpretation is that the statute applies to all attorneys in the

context of proceedings pending before New York state courts.

### 2.    Plaintiff's Section 487 Claims

Here, Plaintiff's Section 487 claims seek to punish Zannikos and Nacchio for purportedly

false statements made in federal bankruptcy court.  For the reasons stated above, the statute does

not apply to these statements.[20]  However, even assuming that Section 487 could reach conduct

---

[20] As an Article I court, a bankruptcy court's authority is not necessarily coextensive with the authority of an Article III court. *See In re Markus*, 78 F.4th 554, 565 (2d Cir. 2023) (noting that a bankruptcy court's sanctioning authority is limited by the bankruptcy code).  However, there is nothing about this distinction that suggests Section 487 should apply to bankruptcy proceedings. Bankruptcy Rule 9011, which permits sanctions for false statements in papers submitted to the court, is modeled after Rule 11 and is nearly identical to it.  *See In re Parikh*, 508 B.R. 572, 584 (Bankr. E.D.N.Y. 2014).  Bankruptcy courts also possess inherent sanctioning power which may be exercised among similar lines as the inherent power of Article III courts.  *See In re Sanchez*, 941 F.3d 625 (2d Cir. 2019) ("[I]nherent sanctioning powers are not contingent on Article III, but rather are, as their name suggests, inherent in the nature of federal courts as institutions charged with judicial functions."); *Markus*, 78 F.4th at 565.  In addition, the bankruptcy court possesses authority under Section 105(a) of the bankruptcy code to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]," 11 U.S.C. § 105(a), which may include the use of contempt or other sanctions as necessary to carry out the provisions of the code, s*ee In re Kalikow*, 602 F.3d 82, 96 (2d Cir. 2010) (citing *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 445 (1st Cir. 2000), *amended on denial of reh'g* (Dec. 15, 2000)).  This regulatory scheme completely covers the sanctioning of false attorney statements before the bankruptcy court.  If anything, some courts have suggested that the interest in uniformity and the need for finality in bankruptcy makes state law even less likely to apply in this context.  *See E. Equip. & Servs. Corp. v. Factory Point Nat. Bank, Bennington*, 236 F.3d 117, 120 (2d Cir. 2001) (holding that state tort claims alleging violation of an automatic bankruptcy stay are completely preempted by federal law, as "the mere threat of state tort actions could prevent individuals from exercising their rights in bankruptcy, thereby disrupting the bankruptcy process"); *Koffman v. Osteoimplant Tech., Inc.*, 182 B.R. 115, 123 (D. Md. 1995) (holding that state law claims for abuse of process and malicious prosecution are preempted by federal bankruptcy law, as "Congress has occupied the field of sanctioning improper behavior in bankruptcy proceedings").

connected to a pending federal court proceeding, Plaintiff's allegations do not meet the high bar required to state a claim under Section 487.  Dkt. No. 8 at 17–19; Dkt. No. 22 at 17.

Plaintiff first alleges that Zannikos and Nacchio made false statements in the Bankruptcy Proceeding regarding Delaney's demand letter to Toyota and that Delaney had a judgment against him for extortion in the HC2 Lawsuit.  Compl. ¶ 53.  Zannikos and Nacchio were not HC2's attorneys in the Bankruptcy Proceeding, which was handled by non-party Goldstein. However, Zannikos did submit a certification and later a similar affidavit stating that "HC2 never terminated the Employment Agreement or took any other action to terminate Delaney's employment by HC2," that "Delaney engaged counsel to demand $450,000 from the Corporate Client," that Delaney's counsel emailed a letter to Toyota "reiterating his demand for a payment and threatening litigation and disclosure of the Corporate Client's privileged and confidential information if his demand was not met by April 14, 2020," and that "[t]he Corporate Client did not capitulate to Delaney's demands or threats."  Compl. ¶¶ 22, 29; *Bankruptcy Proceeding,* Dkt. No. 27-1 ¶¶ 6–8.

Plaintiff has not adequately pled that these statements are false or made with intent to deceive.  Plaintiff relies on this Court's statement that the demand letter on which the claim rests is "a routine demand letter and it's not an extortion."  Compl. ¶ 11 n.1; *HC2 Lawsuit*, Dkt. No. 65 at 21.  However, Zannikos did not purport to represent to the Bankruptcy Court the conclusion that this Court reached with respect to Plaintiff's demand letter and, in any event, none of Zannikos' statements are inconsistent with this Court's conclusion.  Zannikos did not assert that Plaintiff's demand letter was extortionate.  He stated that Delaney engaged counsel to demand $450,000 from TMNA, that Delaney threatened litigation and disclosure of TMNA's privileged and confidential information if his demands were not met, and that TMNA refused to

agree.  None of those statements are alleged or could be alleged to be false.  Delaney did threaten litigation if his demands were not met, which could have resulted in the disclosure of the confidential information, and TMNA refused to capitulate.

Moreover, even if Zannikos had used the word "extort" to characterize Delaney's conduct, the use of that word could not give rise to a claim under Section 487.  Zannikos disclosed the underlying facts—a demand for payment with a threat of litigation and the disclosure of confidential information in connection with that litigation if the demand was not satisfied.  While this Court concluded at the preliminary injunction stage, based on a redacted copy of the letter, that it was routine, *HC2 Lawsuit*, Dkt. No. 65 at 21, that conclusion did not foreclose the possibility that HC2 would ultimately be able to prove that Delaney had engaged in extortion and, in any event, it was not free from doubt.   Under established Second Circuit law, a threat to cause economic loss can become wrongful and extortionate when made "to obtain property to which the threatener is not entitled."  *United States v. Jackson*, 180 F.3d 55, 70 (2d Cir. 1999), *on reh'g*, 196 F.3d 383 (2d Cir. 1999).  The Court did not dismiss HC2's claims on the merits or make factual findings that Delaney did not threaten TMNA or did not demand payment.  *Id.*  And, even if the Court had reached a final conclusion that the letter was not extortionate under its view of the law, that would not have foreclosed Defendants from attempting to argue otherwise as long as they did not lie about the underlying facts.  Section 487 is "not designed to curtail attorneys' expressions of views concerning what the law is or should be."  *Bill Birds*, 149 N.E.3d at 891; *see id.* at 892 n.3; *Urias*, 238 N.E.3d at 842.  After all, Delany was free to bring this Court's rulings to the attention of the Bankruptcy Court.  There is no actionable claim for deceit under Section 487 based on Zannikos' certification.  *See Ray v. Watnick*, 182 F. Supp. 3d 23, 26–28 (S.D.N.Y. 2016), *as amended* (May 3, 2016), *aff'd*, 688 F.

App'x 41 (2d Cir. 2017) (dismissing claims under Section 487 when parties merely disagreed over relevant facts and how they should be characterized).[21]

The second alleged instance of deceit is that the HC2 Defendants falsely informed the Trustee that Plaintiff had a judgment against him for extortion in the HC2 Lawsuit.  Compl. ¶ 15. The Trustee stated to the bankruptcy court that Plaintiff "has a judgment against him for an additional $67,458.91," *id.* ¶ 20, and further stated in reference to the HC2 Lawsuit that "[u]pon information and belief, the Debtor is appealing a judgment entered against him for extorting his prior employer," *id.* ¶ 21.   These statements are untrue.  HC2 did not have a money judgment against Plaintiff in the HC2 Lawsuit.  It had an order dismissing Delaney's counterclaims, which was on appeal.  The HC2 Defendants, who were involved in the HC2 Lawsuit, would have known that these statements were untrue.  However, the HC2 Defendants did not make the statements; they were made by the Trustee, a nonparty.

Section 487 states that attorneys can be held liable for "collusion, or consent[ing] to any deceit or collusion, with intent to deceive the court or any party."  N.Y. Jud. Law § 487.  Under this plain language, an attorney who does not directly make a deceitful statement to the court may be liable under Section 487 if he colludes or consents to the making of the false statement. The attorney who drafts a series of false filings with the intent to deceive the court cannot evade liability by the contrivance of having another sign the papers and submit them.  *See Looff v. Lawton*, 97 N.Y. 478, 483 (1884) (noting that an attorney can deceive the court "by collusion with his opponent").  Here, however, no facts are alleged to support the inference that Zannikos

---

[21] For the same reasons, Nacchio's statement in a state-court proceeding that Delaney had a "scheme to extort a significant payment from the Corporate Client," Compl. ¶ 19, constitutes zealous legal advocacy for his client's position that the letter is extortionate, not a false statement of fact.

and Nacchio made false statements to the Trustee or colluded with him to deceive the court.
HC2 appeared in the Bankruptcy Proceeding on March 16, 2021, shortly after Delaney filed an
amended schedule listing a claim by HC2.  *Id.* ¶¶ 11, 16.  It is a reasonable inference that the
Trustee would have spoken to HC2's lawyer before filing his opposition to Plaintiff's motion to
dismiss on March 26, 2021.  However, the lawyer who appeared for HC2 was Goldstein, not
Zannikos or Nacchio.  There is no basis for an inference that Zannikos and Nacchio spoke to the
Trustee at all.[22]  The mere facts that HC2 appeared in the Bankruptcy Proceeding and the Trustee
then made inaccurate statements about the HC2 Lawsuit in the Bankruptcy Proceeding is not
sufficient to support an inference that Zannikos or Nacchio colluded with the Trustee or with
Goldstein with the intent to deceive the bankruptcy court.

Plaintiff also alleges that Defendants violated Section 487 by filing a false proof of claim.
But Delaney has not alleged facts supporting an inference the claim was knowingly false.  A
proof of claim in a bankruptcy proceeding "serves the important purpose of enabling the parties
to a bankruptcy case to identify with reasonable promptness the identity of those making claims
against the bankruptcy estate and the general amount of the claims, a necessary step in achieving
the goal of successful reorganization."  *In re Hooker Invs., Inc.,* 937 F.2d 833, 840 (2d Cir.
1991).  "A claim is defined as a 'right to a payment, whether or not such right is reduced to
judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,

---

[22] Plaintiff cites to billing records which he alleges show collusion between the Trustee and
Zannikos.  Compl. ¶ 20 ("The now-public billing records show that Messer [the Trustee],
LaMonica, and Herbst were given this false information by the defendants.").  However, the
records are extensive, and Plaintiff is obligated to include in his complaint, rather than buried
somewhere in an attachment, the information he believes is relevant.  *See Ahmad v. Experian
Info. Sols., Inc.*, 2023 WL 8650192, at *5 (S.D.N.Y. Dec. 14, 2023).  Even assuming these
records were properly considered, the Court is unable to locate information within them which
would support an inference that Zannikos or Nacchio made false statements to the Trustee.

equitable, secured or unsecured.'" *In re Mattei*, 2024 WL 1598225, at *10 (S.D.N.Y. Apr. 12, 2024) (quoting 11 U.S.C. § 101(5)).  "The Second Circuit has held 'that the term "claim" is sufficiently broad to encompass any possible right to payment.'" *In re Motors Liquidation Co.*, 598 B.R. 744, 754 (Bankr. S.D.N.Y. 2019) (quoting *In re Mazzeo*, 131 F.3d 295, 302 (2d Cir. 1997)).  Although "the precise dollar amount of a creditor's claim 'may not be finally determined until adversary proceedings have been concluded,'" a proof of claim must be filed before the bar date or it will be lost.  *In re Enron Corp.*, 419 F.3d 115, 128 (2d Cir. 2005) (quoting *Hooker Invs.*, 937 F.2d at 840).

Delaney asserts that HC2's proof of claim for $1,180,152.67 was knowingly false because that sum was mostly legal fees from the HC2 Lawsuit, and Judge Liman never ordered Delaney to cover those fees. Compl. ¶ 23.  However, as stated above, a proof of claim is not a statement of clear and established debt.  It puts the debtor, the Court, and the world of creditors on notice of what the creditor is claiming.  HC2 could properly file a proof of claim even if the claim was contingent or uncertain, and in fact was required to do so promptly to preserve its rights to any possible distribution pursuant to the claim.  HC2 could properly submit a contingent proof of claim based on fees it is seeking, but has not yet received, in the HC2 lawsuit.[23]

Finally, Delaney alleges that Zannikos and Nacchio "instructed Goldstein to continue to appear at hearings in Delaney's bankruptcy case even after HC2 had been ordered to withdraw from the case with prejudice on August 1, 2021."  Compl. ¶ 53.  Regardless whether such appearances were proper or not, this does not state a cause of action for deceiving the court or a party.  Goldstein openly appeared at the hearings.  *See Urias*, 238 N.E.3d at 843 (rejecting

---

[23] Plaintiff also has not alleged that the proof of claim was filed by any Defendant in this matter. Absent such an allegation, the logical inference is that it was filed by Goldstein, who was HC2's counsel in the Bankruptcy Proceeding.

argument that attorney was deceitful based on arguably incorrect calculations that were "disclosed to the court when the settlement was approved").

Plaintiff's claims under Judiciary Law § 487 must be dismissed.[24]

## B.    Negligent Infliction of Emotional Distress

To plead a negligent infliction of emotional distress ("NIED") claim under New York Law, a plaintiff must allege: "(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021). Delaney does not allege a plausible NIED claim.

Delaney claims that Zannikos and Nacchio had ethical duties towards him as an opposing party and breached those duties by making false statements and accusations. Compl. ¶¶ 66–67. However, "courts which have addressed the issue have uniformly found that an attorney does not have a duty to a third party, including an opposing party, the breach of which would subject the attorney to liability." *Clark v. Druckman*, 624 S.E.2d 864, 869 (W. Va. 2005) (collecting cases); *see* Restatement (Third) of the Law Governing Lawyers § 51 (2000), cmt. c ("A lawyer representing a party in litigation has no duty of care to the opposing party under this Section, and hence no liability for lack of care, except in unusual situations."); *Drago v. Buonagurio*, 386 N.E.2d 821, 822 (N.Y. 1978); *Baxt v. Liloia*, 714 A.2d 271, 274–75 (N.J. 1998) (noting that rules of professional conduct are not intended to serve as a basis for civil liability). As the courts have recognized, "creation of a duty in favor of an adversary of the attorney's client would create an unacceptable conflict of interest which would seriously hamper an attorney's effectiveness as

---

[24] Because Plaintiff does not state a primary claim under Judiciary Law § 487, his claims alleging conspiracy to violate Section 487 must also be dismissed. *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006); *Crigger v. Fahnestock & Co.,* 443 F.3d 230, 237 (2d Cir. 2006).

counsel for his client." *Friedman v. Dozorc*, 312 N.W.2d 585, 591–92 (Mich. 1981); *see Druckman*, 624 S.E.2d at 869. Delaney therefore may not maintain an NIED claim based on negligence by opposing counsel in a litigation against him.[25]

In addition, Plaintiff's allegations of emotional distress are entirely conclusory. *See* Compl. ¶¶ 70–72 ("The defendants' conduct caused Delaney severe emotional distress and mental trauma . . . From 2021–2024, Delaney has suffered severe emotional distress and disability . . . As a direct and proximate result of the defendants' conduct, the plaintiff suffered humiliation, severe emotional distress, and mental and physical pain and anguish."); *Akhtar v. Aggarwala*, 2024 WL 3862504, at *12 (S.D.N.Y. June 5, 2024) (dismissing complaint where Plaintiff alleged that the "risk of losing his business has caused [him] severe distress, affecting his heath [sic] and well being"), *report and recommendation adopted sub nom. Akhtar v. Adams*, 2024 WL 3862673 (S.D.N.Y. Aug. 19, 2024); *Specht v. City of N.Y.*, 15 F.4th 594, 606 (2d Cir. 2021).

The fourth element, the guarantee of genuineness, is also not satisfied. The guarantee of genuineness guards against "the danger of vexatious suits and fictitious claims" stemming from the fact that "[m]ental disturbance is easily simulated." *Ferrara v. Galluchio*, 152 N.E.2d 249, 242 (N.Y. 1958). The criteria are strict, and "the plaintiff generally must plead that the breach endangered his physical safety or caused him to fear for his physical safety." *Francis*, 992 F.3d at 81 n.57. There are no such allegations here, nor is such an inference plausible based on Plaintiff's generalized claims of distress. *See Veras v. N.Y.C Dep't of Educ.*, 2024 WL 3446498,

---

[25] Delaney also consistently alleges that the false statements were intentional. "Conduct that is alleged to be 'intentional and deliberate' is 'outside the ambit of actionable negligence,'" because negligence and intentional conduct are mutually exclusive. *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 363 (S.D.N.Y. 2021) (quoting *Wahlstrom v. Metro-N. Commuter R. Co.*, 89 F. Supp. 2d 506, 531 (S.D.N.Y. 2000)).

at *7 (S.D.N.Y. July 17, 2024); *Akhtar*, 2024 WL 3862504, at *13 ("[A]lthough Akhtar alleges

that his health and wellbeing were impacted due to the stress caused by the noise complaints . . .

he has also failed to allege that he feared for his physical safety.").  The guarantee of

genuineness can also be fulfilled in certain other extreme circumstances recognized to cause

genuine distress, "as in cases involving the mishandling of a corpse or the transmission of false

information that a parent or child had died." *Taggart*, 14 N.Y.S.3d at 396; *see also* Restatement

3d of Torts: Liability for Physical and Emotional Harm, § 47 ("[C]ourts have imposed liability

on hospitals and funeral homes for negligently mishandling a corpse and on telegraph companies

for negligently mistranscribing or misdirecting a telegram that informs the recipient, erroneously,

about the death of a loved one.").  The facts alleged here do not fit into any such category.

### C.    Breach of Contract

Delaney's breach of contract claim is based on allegations that "After Judge Mazer-

Marino's denial of HC2's emergency motion to quash or limit Delaney's depositions of HC2's

management, the defendants had Goldstein e-mail Delaney to reach an agreement with him [to]

not oppose their motion to withdraw their proof of claim in exchange for their exiting the case

with prejudice."  Compl. ¶ 76.  However, after Delaney consented to this plan, "Goldstein

continued to appear in the case and successfully opposed Delaney's voluntary dismissal of the

bankruptcy case."  *Id.* ¶ 77.  Delaney states that "[t]he defendants violated the settlement

agreement between the parties and also the August 1, 2021 order for it to exit the bankruptcy

case with prejudice."  *Id.* ¶ 79.

"Settlement agreements are contracts," and a breach of contract claim is available for

breach of a settlement agreement.  *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d

481, 484 (2d Cir. 1999).  But even assuming that the order of August 1, 2021, finalized a

settlement between HC2 and Delaney, *see* Dkt. No. 24 at 7, Delaney has not alleged breach of

such settlement.  The order states that "Claim 2 of HC2 is hereby withdrawn, with prejudice to HC2's right to file another proof of claim in this bankruptcy case." *Bankruptcy Proceeding*, Dkt. No. 83.  But HC2 did not file another proof of claim in the bankruptcy case.  Delaney describes the agreement as a stipulation to "exit with prejudice," Dkt. No. 24 at 8, but it is not.  The order explicitly states that "[t]he entry of this Order does not limit or affect the jurisdiction of this Court over HC2 or over any adversary proceeding currently pending before this Court that involves HC2." *Bankruptcy Proceeding*, Dkt. No. 83.  This makes clear that the stipulation did not provide that HC2 would entirely cease litigating matters related to Delaney's bankruptcy, and the adversary proceeding remained pending.  The plain terms of the stipulation concerned withdrawal of a claim, not withdrawal of any right to participate in the bankruptcy.

Delaney specifically states that HC2 violated the settlement agreement by later objecting to Delaney's voluntary dismissal of the bankruptcy case.  However, this objection was not based on any proof of claim filed against Delaney in the bankruptcy case, as would have been barred by the order of August 1, 2021.  Rather, the objection was based on a later settlement between HC2 and the trustee in bankruptcy in which HC2 agreed to pay the estate $25,000 in exchange for the release of Delaney's claims against HC2.  *See Bankruptcy Proceeding*, Dkt. No. 125. Even assuming that this settlement was merely a pretext for HC2 to meddle in Delaney's bankruptcy, it is not contrary to the August 1, 2021, order because such order does not bar HC2 from agreeing to settle Delaney's claims against it.  It only bars HC2 from filing a proof of claim in the bankruptcy, which HC2 did not do.  Therefore, Delaney does not adequately allege that HC2 violated this order or any stipulation or settlement which its terms reflect.

### D.    New York Labor Law § 740

New York Labor Law § 740 prohibits an employer from taking retaliatory action against an employee who "discloses, or threatens to disclose to a supervisor or to a public body an

activity, policy or practice of the employer that the employee reasonably believes is in violation

of law, rule or regulation or that the employee reasonably believes poses a substantial and

specific danger to the public health or safety." N.Y. Labor Law § 740. To plead a violation of

Section 740, a plaintiff must allege: "(1) [a] retaliatory action, (2) [an] activity protected by the

statute, and (3) a causal link between the two." *Pierce v. Better Holdco, Inc*., 2023 WL 6386920,

at *4 (S.D.N.Y. Sept. 29, 2023).

Plaintiff's retaliation claim is that he "engaged in the protected activity of complaining to

the government about HC2's violation of the law regarding its pension and stock ownership

plans by failing to furnish him with a copy of the Summary Plan Description in violation of the

Employee Retirement Income Security Act of 1974 ("ERISA") and the labor laws," and that in

retaliation defendants opposed the dismissal of his bankruptcy and had WilmerHale accuse him

of extortion. Compl. ¶¶ 86–92. Plaintiff does not explain what he did to "complain[] to the

government" or why he would have believed HC2's failure to provide him with a plan

description was contrary to law, rule, or regulation, or in any way improper. *See Webb-Weber v.

Cmty. Action for Hum. Servs., Inc*., 15 N.E.3d 1172, 1175 (N.Y. 2014) (holding that plaintiff

need not cite a particular regulation, but "must identify the particular activities, policies or

practices in which the employer allegedly engaged"). He does not allege that HC2 was even

aware of his action of "complaining to the government." It is not plausible to infer a causal link

between the purportedly protected action and HC2's decision to dispute the motion to dismiss in

the Bankruptcy Proceeding or WilmerHale's decisions in the Florida litigation, which from the

allegations in the complaint appear entirely unrelated to any issues with HC2's pension plans.[26]
Plaintiff has not alleged a claim under Labor Law § 740.

### E.    ADA Discrimination

To plead an ADA discrimination claim, a plaintiff must allege that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005); *see also Caskey v. Cty. of Ontario*, 560 F. App'x 57, 58 (2d Cir. 2014).  This claim fails at the threshold, as Delaney does not allege that he is disabled.  Under the ADA, an individual is disabled if they have "a physical or mental impairment that substantially limits one or more major life activities," a "record of such an impairment," or is "regarded as having such an impairment."  42 U.S.C.S. § 12102(1).  Delaney simply asserts that he "is an individual with a disability within the meaning of 42 U.S.C. § 12102."  Compl. ¶ 103.  However, nowhere in the Complaint does he ever explicitly reference a disability or perceived disability.  When a plaintiff alleging employment discrimination under the ADA does not state a

---

[26] In some circumstances, causation may be inferred from temporal proximity.  *See Bamba v. U.S. Dep't of Homeland Sec.*, 2024 WL 3924810, at *18–20 (S.D.N.Y. Aug. 23, 2024).  Here, however, such an inference is not plausible because HC2 had already accused Delaney of extortion and contested the dismissal of his bankruptcy before Delaney engaged in a protected activity.  Delaney alleges that he engaged in a protected activity starting in March of 2022.  Compl. ¶ 86.  But the defendants had been telling Courts that Delaney was extorting them since 2020, *see HC2 Lawsuit*, Dkt. No. 1, and had already contested the dismissal of Delaney's bankruptcy in March 2021, Compl. ¶ 20–22.  Even though HC2 took similar actions in 2022, it is not plausible to infer that it suddenly decided to do so as a result of the protected activity.  *See Forest v. N.Y. State Off. of Mental Health*, 2015 WL 6965149, at *9 (S.D.N.Y. Nov. 10, 2015) (holding that even though there was a close temporal relationship between the plaintiff's complaint and the retaliatory action, because the retaliatory action was the result of a process that had begun before the complaint occurred, the plaintiff had not alleged sufficient facts to "give rise to a reasonable inference of causation"), *aff'd*, 672 F. App'x 42 (2d Cir. 2016).

disability or perceived disability in the complaint, their claim fails as a matter of law. *See Cagle v. Weill Cornell Med.*, 680 F. Supp. 3d 428, 438 (S.D.N.Y. 2023) ("Plaintiff's Complaint merely invokes Title I of the ADA without stating facts that support that she is disabled or that she suffered adverse action based on her disability . . . Further, Plaintiff does not allege that Defendant was aware of her disability or discriminated against her on the basis of her disability.").[27]

### F.    Title VII Retaliation

To plead a claim of retaliation under Title VII, a plaintiff must allege: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Dooley v. Jetblue Airways Corp.,* 636 F. App'x 16, 19 (2d Cir. 2015), (quoting *Littlejohn v. City of NewY*ork, 795 F.3d 297, 315–16 (2d Cir. 2015) (internal citations omitted)). But Plaintiff does not allege that he engaged in any activity protected under Title VII. He states that "defendants discriminated against the plaintiff because he has opposed their

---

[27] The HC2 Defendants also contend that Delaney's claims under the ADA and Title VII should be dismissed because Delaney failed to exhaust administrative remedies. Dkt. No. 8 at 8–9. However, the exhaustion of administrative remedies is an affirmative defense, not a pleading requirement. *See Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018), ("[T]he burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense."); *Ayala v. U.S. Postal Serv.*, 727 F. App'x 15, 17 (2d Cir. 2018) ("[A] plaintiff need not plead exhaustion"). A court may dismiss a complaint if it is evident from the face of the complaint that a plaintiff did not exhaust administrative remedies, but a plaintiff is not required to affirmatively plead exhaustion. *See Simon v. Fed. Prison Indus. Inc*., 2024 WL 3487940, at *6–7 (S.D.N.Y. July 18, 2024) ("Although a court may dismiss a complaint due to failure to exhaust administrative remedies when such failure is apparent from the face of the complaint, a plaintiff generally is not required affirmatively to plead exhaustion of administrative remedies."). In the instant case, it is not clear that Delaney has not exhausted administrative remedies. Thus, his complaint may not be dismissed on this ground. *See Samuels v. Fischer*, 168 F. Supp. 3d 625, 654 (S.D.N.Y. 2016) ("Plaintiff's non-exhaustion is not clear from the face of the Amended Complaint . . . It would thus be premature to dismiss Plaintiff's claims for failure to exhaust his administrative remedies.").

unlawful employment practices, or because 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' concerning their unlawful employment practices." Compl. ¶ 112. This is a "formulaic recitation of the elements of a cause of action," which "will not do." *Twombly*, 550 U.S. at 555. Plaintiff does not plead any facts to support his Title VII claim.

### III.    TMNA's Additional Arguments

TMNA additionally argues that it should be dismissed from the lawsuit because it is not Delaney's employer and was not involved in the relevant allegations. Dkt. No. 20 at 8–12. This provides an alternative basis for dismissal of the complaint against TMNA.

Throughout his Complaint, Delaney asserts that he is TMNA's former employee. *See* Compl. ¶¶ 1, 83–84, 87, 96, 102. However, besides stating in a conclusory fashion that Toyota participated in or was responsible for various acts, Plaintiff does not plead any facts supporting Toyota's involvement in any of his causes of action. Plaintiff also does not plead any facts showing that he was an employee of Toyota. He simply states that he was an employee, Compl. ¶ 1, states that WilmerHale was Toyota's law firm, *id.* ¶¶ 26 n.9, 46, and quotes from certain court documents (which Plaintiff alleges contain falsehoods) suggesting Delaney participated in a "document review project" for WilmerHale and Toyota, *id.* ¶ 22. There is no factual basis to infer that this relationship, whatever it was, would make TMNA responsible for any of the allegations in the Complaint. New York Judiciary Law § 487 applies only to attorneys, and the relevant actions were taken in the Bankruptcy Proceeding by attorneys for HC2, not TMNA. The NIED and breach of contract claims also stem from the Bankruptcy Proceeding. Plaintiff has not pled that TMNA was involved in that proceeding. The New York Labor Law § 740 claims concern HC2's failure to provide Delaney with a Summary Plan Description, not TMNA's.

41

As to the ADA and Title VII claims, the allegations of the Complaint are entirely insufficient to establish that Delaney was an "employee" as required by those statutes. In his opposition to the motion to dismiss, Plaintiff explains that he worked for TMNA "through a three-party outsourcing agreement," between HC2, WilmerHale, and TMNA, Dkt. No. 26 ¶ 39, and that "e-mails about the plaintiff's employment, daily work, and termination were all managed, supervised, and ordered by Toyota," *id.* However, Plaintiff did not plead this in his Complaint, only asserting it in opposition to the motion to dismiss.[28] The only facts pled in the Complaint are that WilmerHale was Toyota's law firm, Compl. ¶ 26 n.9, Zannikos said that WilmerHale was a customer of HC2, and Zannikos said that Delaney participated in "a document review project" for Toyota, *id.* ¶¶ 22, 46. This provides no basis to infer that TMNA had functional or formal control over Delaney's work, as required to plead an employment relationship. *See Robbins v. Candy Digital*, 2024 WL 5056429, at *19–21 (S.D.N.Y. Dec. 9, 2024). Customers and clients of customers cannot simply be assumed to have control over the work done by the employees of a contractor. The absence of allegations showing that TMNA had "immediate control" over the purported discriminatory or retaliatory decisions provides an alternative basis to dismiss the ADA and Title VII claims against TMNA. *Clinton's Ditch Co-op Co. v. N.L.R.B.*, 778 F.2d 132, 138 (2d Cir. 1985).[29]

[28] In some cases, "the mandate to read the papers of pro se litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint." *Crum v. Dodrill*, 562 F. Supp. 2d 366, 373 (N.D.N.Y. 2008). As previously stated, Plaintiff receives no such solicitude as an attorney representing himself. He cannot raise new facts on opposition which were not contained in his complaint.

[29] TMNA argues that the Court should take notice of contracts which purportedly show that Plaintiff was not an employee of TMNA. Dkt. No. 20 at 8–12; Dkt. No. 49 at 2–3. These contracts are not referenced in the Complaint, and documentary evidence does not become

## CONCLUSION

The HC2 Defendants' motion to dismiss is GRANTED.  TMNA's motion to dismiss is

GRANTED.  Plaintiff's motions to strike are DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 7, 20, 43, and 50.

SO ORDERED.

Dated: January 3, 2025
      New York, New York

                                               LEWIS J. LIMAN
                                    United States District Judge

---

integral to the complaint merely because it "flatly contradict[s]" Plaintiff's allegations.  Dkt. No.
49 at 3; *see In re Turquoise Hill Res. Ltd.*, 2024 WL 4711185, at *9–10 (S.D.N.Y. Nov. 7, 2024)
(noting that the integral to the complaint doctrine does not cover "all other pieces of information
that might be considered to contradict or contextualize Plaintiffs' allegations").  However,
because these documents are not necessary to the Court's holding, there is no need to decide
whether they may be properly considered.